## UNITED STATES *v.* Moos & Co. *et al.* (No. 1343).[1]

OLIVE OIL IN TINS—GALLON MEASURE.

All olive oils are not of the same specific gravity. The method adopted here by the collector for determining the quantity of the importation in gallons was correct. The English wine gallon of 231 cubic inches capacity, and not a lesser quantity, though accepted by the trade, is the "gallon" of paragraph 38, act of 1909.

United States Court of Customs Appeals, May 28, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7534 (T. D. 34216).

[Reversed.]

*William L. Wemple*, Assistant Attorney General (*Leland N. Wood*, special attorney, of counsel), for the United States.

*Brown & Gerry* and *Brooks & Brooks* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Olive oil imported at the port of New York and classified by the collector of customs as "olive oil in tins containing less than 5 gallons each," was assessed for duty at 50 cents per gallon under the provisions of that part of paragraph 38 of the tariff act of 1909 which reads as follows:

38. Olive oil, * * * in * * * tins, or other packages, containing less than five gallons each, fifty cents per gallon.

The importers protested that the merchandise was olive oil not specially provided for and therefore dutiable at 40 cents per gallon under that part of said paragraph 38 which reads as follows:

38. Olive oil, not specially provided for in this section, forty cents per gallon; * * *.

---

[1] Reported in T. D. 34528 (26 Treas. Dec., 932).

The Board of General Appraisers sustained the protests and the Government appealed. The olive oil in controversy was imported in tins. After the arrival of the goods one or more tins of each brand of oil was weighed and the gross weight of tin and oil secured in pounds and fractions of a pound. The tin was then opened and the oil withdrawn and weighed, which gave the weight of the oil which the tin contained. The weight of the oil subtracted from the gross weight of the tin and oil, gave the weight of the tin. A measured gallon of the same oil was then weighed, and that furnished the weight of a gallon of that particular brand in pounds and fractions of a pound. On these data, and without opening all the tins of each importation, the number of gallons per tin was calculated by dividing the net weight of the oil in each tin by the ascertained weight of a gallon of olive oil of that special brand. By this method the quantity of oil contained in the tins covered by the several protests and the weight of the oil per gallon was found by the collector to be as follows:

| Protest No. | Name of importer. | Gallons per tin. | Weight of a gallon in pounds. |
|---|---|---|---|
| 648878 | Strohmeyer & Arpe Co | 4.93 | 7.62 |
| 710598 | R. U. Delapenha & Co | 4.93 | 7.62 |
| 705402 | .....do | 4.91+ | 7.64 |
| 710371 | Francis H. Leggett & Co | { 4.90 / 4.92 } | } 7.62 |
| 708261 | .....do | 4.88 | 7.62 |
| 666517 | .....do | 4.87+ | 7.61 |
| 674893 | Rockhill & Vietor | 4.93+ | 7.625 |
| 664551 | Von Bremen, Asche & Co | 4.93 | 7.56 |
| 705243 | A. Starace | 4.83 | 7.56 |
| 705244 | .....do | 4.83 | 7.56 |
| 679367 | .....do | 4.83 | 7.56 |
| 668997 | .....do | 4.87+ | 7.59 |
| 663787 | Austin, Nichols & Co | 4.91 | 7.59 |
| 646218 | Moos & Co | 4.92 | 7.63 |

At the hearing before the board the importers contended that the tins actually contained 5 gallons of oil, and that whether they did or not they must be so considered inasmuch as they were regarded and accepted by the trade as 5-gallon tins containing that quantity of oil. The witnesses produced by the importers in support of this contention testified in effect that the tins were known in the trade as 5-gallon tins, and that they were bought, sold, labeled, advertised, and represented to buyers as containing 5 gallons of oil. Some of the witnesses testified that from time to time tests were made by them of the quantity of oil in the tins, but none of them, so far as is disclosed by the record, actually tested any of the tins which were made the subject of protest, and consequently none of them was in a position to say just what was the quantity of oil imported in such tins. The tests for quantity made by the importers of olive oils other than those imported were not made on the basis of the weight of a gallon of the particular oil tested, but on the flat basis of 7.56 pounds per

gallon for all oils, irrespective of brand. Some of the witnesses admitted that even on this basis tins of oil had been found short of 5 gallons, but stated that notwithstanding that fact no allowance was made to the buyer for the deficiency, and that such short tins were sold by the importers and bought and paid for by the buyers as 5 gallons of oil. It appears from the record that olive oil is not bought abroad by the gallon, but by weight, and that it is sold in this country not by weight, but by the gallon. The board on this evidence held, first, that the Government had not ascertained the actual quantity of oil imported, and, second, that the tins covered by the importations were commercial 5-gallon tins of olive oil. On these findings of fact the board sustained the protests and the Government appealed.

Inasmuch as the method pursued by the Government in determining the number of gallons contained in the tins was designed to secure an accurate result, and inasmuch as there was no evidence whatever produced by the importers showing that there was any error upon the part of the collector in ascertaining the quantity of oil held by the tins of the several importations, we find ourselves unable to sustain the first finding of the board. It was of course wholly impracticable to open each tin and to measure the number of gallons which it contained by a gallon measure. Such a course would have caused serious loss and would have necessitated the resealing of the tins, if not the repacking of the oil in new containers, a contingency which the collector was fully justified in avoiding if quantities might be ascertained by a method less prejudicial to the goods, especially if that method was sanctioned by the trade itself. As olive oils of the *same brand* had apparently the same specific gravity the collector was warranted in taking the weight of a single gallon of any brand as a basis for the determination of the quantity of oil in all tins of that brand. Some of the containers may have weighed more and some less than the sample container, but as the weight of the sample tins minus the oil appears to have been accurately taken, that weight for all tins of the same brand must be accepted in the absence of any showing to the contrary by the importers. We think, therefore, that the means adopted by the collector to ascertain the number of gallons per tin was designed to secure a correct result, and in this opinion we are confirmed by the fact that some of the importers testified that the weighing test was the method employed by them in ascertaining the number of gallons per tin. In making *their* test, however, the importers, instead of taking as the basis for their calculation the actual weight of a gallon of the brand to be tested, took 7.56 pounds as the weight per gallon of all olive oils, and to that must be attributed their difference with the collector as to the *actual* quantity of oil imported. In view of the fact that all olive oils are not of the

same specific gravity and that for the same volume some brands weigh more and some less than others, it is apparent that a fixed basis of 7.56 pounds can not be made applicable to all olive oils, and that if it is used for the purpose of determining quantities of olive oils having a specific gravity which is not the equivalent of that weight an inaccurate result is sure to follow.

We find that on the basis of 7.56 pounds to the gallon, two sample tins out of the 15 examined reached 4.97 + gallons to the tin, three 4.96 +, two 4.95 +, one 4.94 +, two 4.93 +, one 4.91 +, one 4.89 +, and three 4.83 +. From this it is evident that even on the importers' incorrect basis of calculation, none of the sample tins examined measured up to 5 gallons and that less than half of them came within 1 per cent of containing 5 gallons. Taking the actual weight of a gallon of oil of each brand as the basis of calculation, the more accurate method of ascertaining the contents of the tins without opening them, not one of the sample tins tested contained 4.95 gallons of oil.

The board found, however, that the tins were, *commercially. speaking*, 5-gallon tins, and from that it was deduced that the several importations were excluded from the operation of the last clause of paragraph 38. If we sustain that conclusion, we must sustain it either on the theory that the duty of 50 cents per gallon was laid on tins of less than 5 gallons capacity or on the theory that what constituted 5 gallons of olive oil might be determined by trade usage and custom. We can not agree with either theory. Had paragraph 38 imposed a duty of 50 cents per gallon on tins of less capacity than 5 gallons, it is possible that evidence *might* have been properly given as to what was the commercial understanding of a 5-gallon tin. No such construction, however, can be placed on the paragraph and this court so declared in two cases, in which it was held that the duty of 50 cents per gallon was not laid by the paragraph upon tins of less than 5 gallons capacity, but on tins containing less than 5 gallons of oil. United States *v.* Palma (4 Ct. Cust. Appls., 140; T. D. 33412); United States *v.* Sprague, Warner *et al.* (4 Ct. Cust. Appls., 358; T. D. 33532). In other words, whether a duty of 40 cents a gallon or of 50 cents a gallon should attach to oil in tins must be determined by the quantity of oil contained in the tins and not by the size of the package. That brings us to the consideration of whether the expression "five gallons" used in the paragraph was intended by Congress to mean a trade 5 gallons or 5 gallons measured in accordance with official standards.

It is a matter of history that most of the weights and measures in common use in the United States are of English origin and in colonial times were the legally established weights and measures of this country. The colonies having accomplished their independence, the Congress was authorized by the Constitution to "fix the standard of

weights and measures;" but the authority thus conferred was never exercised so far as the enactment of general legislation was concerned. From that it followed that the weights and measures of England continued to be the legal weights and measures of the United States unless altered by State legislation or by a usage so general, common, and long established as to have ripened into law. Whether because of State legislation or because of variations in standards brought about by local custom, common use, or carelessness, a lack of uniformity in the weights and measures had apparently so far developed in the year 1830 that a resolution was adopted by the United States Senate directing the Secretary of the Treasury to make an investigation of the weights and measures in use in the principal customhouses of the country and report the result to the Senate. (Senate resolution of May 29, 1830.) As a result of this investigation the avoirdupois pound, the English wine gallon of 231 cubic inches capacity, and the bushel of 2,150.42 cubic inches capacity were adopted by the Treasury Department as standard measures for customs uses. (See letter of the Secretary of the Treasury to the President of the Senate, dated June 20, 1832, and F. R. Hassler's report therewith forwarded; also supplementary report of F. R. Hassler, dated June 29, 1832, and letter of the Secretary of the Treasury to the President of the Senate, dated June 30, 1832.)

The standards of weights and measures adopted and in use in the customhouses were so far recognized by the Congress that they were ordered to be sent to the governors of the States or such persons as they might appoint for the use of the States and "to the end that an uniform standard of weights and measures may be established throughout the United States." (Joint resolution of June 14, 1836.)

Under these circumstances, we think there is no escaping the conclusion that the gallon for customs purposes was a vessel of 231 cubic inches capacity, and as appears from the official documents and records was the equivalent in volume of 8.33888220 pounds avordupois of water weighed at its maximum density at 30 inches and at a temperature of 62° F. (See "gallon," Century Dictionary, and report of Hassler, *supra*.) That gallon having been recognized by Congress as a standard measure, and being in use in the customhouses of the United States at the time of the passage of the tariff act of 1909, it is evident, we think, that the term "gallon," as used in the act, meant the quantity measured by a vessel of 231 cubic inches capacity and not a lesser quantity which the trade might accept as a gallon of some particular commodity.

But even if no standard gallon had been officially adopted for customs purposes, the evidence adduced by the importers wholly failed to establish the existence of a commercial gallon measure for olive oil different from that in general use for the measurement of

other liquids. The witnesses who testified on the subject of commercial usage confined themselves to the statement that oil which came in 5-gallon tins was commercially regarded as 5 gallons of oil, regardless of the actual quantity which the tin might contain. None of them pretended to say, however, that there was any commercial measure by which a commercial gallon of olive oil might be ascertained or that any specific quantity less than 5 standard gallons constituted 5 trade gallons of olive oil. For these reasons we think that the decision of the Board of General Appraisers should be reversed.

*Reversed.*